UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:21 CR 63 SRC (ACL) |
| | ) |
| BENJAMIN PINKERTON, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned is Defendant Benjamin Pinkerton's Motion to Suppress (Doc. 34) evidence and statements that were obtained following a stop of his vehicle on April 11, 2021.

Pinkerton argues that "[t]he officer prolonged the traffic stop beyond the time reasonably required to complete the mission of issuing a warning ticket."  (Doc. 34 at 4.)  He further claims "[t]he officer had no reasonable suspicion of any other crime to extend the traffic stop to conduct a dog sniff."  *Id*.  After the canine alerted to the odor of controlled substances, a search of the truck resulted in the seizure of three guns and Pinkerton made incriminating statements at the jail.  Pinkerton further argues that his confession should be suppressed as fruit of the poisonous tree.  *Id*. at 10.

The Government filed a Brief in Opposition wherein it noted that Pinkerton did not "challenge the validity of the canine sniff on his truck."  (Doc. 36 at 7.)  The Government argues that Officer Yoder had reasonable suspicion to conduct a canine sniff

based on his observations, and the traffic stop was not prolonged as Officer Yoder was a canine officer and his canine sniff was conducted before the stop was complete. As the canine's alert provided probable cause for a search, the Government argues that the physical evidence that was seized, as well as Pinkerton's statements should be admissible at trial.

After an evidentiary hearing,[1] both parties submitted memoranda. (Docs. 43, 44, 45.) Pinkerton's post-hearing brief challenged the canine's alert. (Doc. 43 at 10-11.) A supplemental evidentiary hearing was held to address Pinkerton's new argument. Following that hearing, Pinkerton requested time to consult an expert and brief his position regarding the canine's passive alert. (Doc. 52, 56.) Pinkerton later withdrew his challenge regarding the canine's alert (Doc. 59), and no further briefing was offered by the Government (Doc. 61).

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted and that the Defendant's Motion to Suppress be denied.

## I. Findings of Fact

Shortly before midnight on April 11, 2021, Cape Girardeau Police Department Patrolman and Canine Handler Gabriel Yoder noticed an older model GMC pickup cross the centerline several times. When Yoder began following the truck, it reduced speed

---

[1] The Suppression Hearing Transcript, hereinafter "Tr. ___," was entered as Doc. 41.

down to around 20-25 miles per hour in a 35-mile-per-hour zone. Patrolman Yoder noted that the speed "just became inconsistent." (Tr. 16.) Based on those observations, Yoder activated his traffic lights and the truck pulled over.

As Yoder approached the truck, he noticed "that the driver had a freshly lit cigarette in his mouth and was looking intently into his. . .driver's side mirror." *Id*. at 17. Yoder approached from the passenger side because "[i]t's safer not to be approaching in traffic." *Id*. at 18. Yoder believed that:

> . . .based on where the vehicle was coming from, the inconsistent driving behavior that appeared to be in my presence and being - - trying to be able to pay attention to what I was doing and then lighting a cigarette which people do when they're nervous, and then locking very intently in the rearview mirror looked like there was something going on, and I didn't know what. So at that time I requested a second unit to arrive.

*Id*. 18-19. That wasn't Yoder's routine procedure for a standard traffic stop. He explained that he calls for a second unit when "[t]here are several. . .things that may lead you to believe that there's some sort of criminal activity going on." *Id*. at 19.

Once he arrived at the passenger side window, Officer Yoder observed the Defendant, Benjamin Pinkerton—the only person in the vehicle—in the driver's seat. Yoder asked Pinkerton if "his vehicle's alignment was all right due to the crossing of the centerline several times." *Id*. at 20. Pinkerton responded that "he was trying to avoid potholes." *Id*. Yoder observed that it was not necessary to avoid potholes as he followed Pinkerton. *Id*. at 21.

Next, Yoder asked Pinkerton for proof of insurance. Pinkerton responded that his insurance was expired, and he did not have any old copies that he could provide to

Page 3 of 17

Patrolman Yoder.  Pinkerton was then asked to hop out of the vehicle and into the patrol car so Yoder could issue him a warning ticket.

Yoder had observed that the pickup bed was loaded with a large volume of items.  He also noticed an empty pistol holder on the center floorboard in plain view.  Yoder asked Pinkerton if he was moving.  Pinkerton replied, "that he goes dumpster diving." *Id*. at 22.  Based on his observation of the empty pistol holder, Yoder asked Pinkerton to step out of the vehicle.  Yoder explained he routinely does that, because "[o]n traffic stop safety it makes it easier to talk to people, and it eliminates the possibility that if they want to flee they can just keep on driving and initiate a vehicle pursuit, and it's easier to hear what they're saying."  *Id*. at 23.

Once Pinkerton was outside of the truck, Yoder asked, "any firearms on you?  I saw you had a holster in there."  Gov't. Ex. #1 (Disc containing "Yoder Body Cam" recording) at 02:24.[2]  Pinkerton appeared surprised by the question and asked, "Holster?"  Yoder responded, "There was like a holster in that bag right in the center."  After a delay, Pinkerton answered, "No, I don't have no firearms on me."  *Id*. at 02:33. Yoder then requested permission to search Pinkerton for weapons.  Pinkerton did not consent to a search of his person.  He claimed that he did not have any weapons.

Next, Patrolman Yoder conducted a *Terry* frisk for weapons.  During the pat down, Pinkerton advised Yoder that he had a knife in his pocket.  Pinkerton removed the knife and gave it to Yoder, who put it in his pocket for safety purposes.  Yoder did not

---

[2] The undersigned notes that use of headphones while reviewing the recording resulted in more dialogue being audible.

locate any additional weapons during the pat down.  He then directed Pinkerton to take a seat in the patrol vehicle.

Patrolman Yoder explained that having a driver sit in the vehicle is "usually quicker.  I can talk to them while I'm running their information and stuff.  And that way I don't have to come back and forth to them."  (Tr. at 25.)  He noted that was a routine part of every traffic stop.  *Id*.  Specifically, Yoder verifies that the subject's license is good, whether they have any warrants, their driving history, check the license plates are active and for the correct vehicle, and prior law enforcement contacts with Cape Girardeau Police Department (CGPD).  *Id*. at 25-27.  Pinkerton did not have any outstanding warrants on the MULES system (*id*. at 26), but he did have prior contacts with CGPD.  Yoder reviewed this information on a little laptop in his patrol vehicle.

While reviewing the MULES and CGPD records, Yoder engaged Pinkerton in conversation about the empty holster he observed in plain view, a puppy that was in the passenger side of the truck cab, and Pinkerton's dumpster diving hobby.  *Id*. at 28.  It was a friendly conversation.  Yoder explained that he usually tries "to engage in something in that manner with most people just because most people get a little nervous with law enforcement, so [he] tr[ies to] calm them down."  *Id*. at 28-29.  Even though Yoder made those efforts, he observed that Pinkerton "was continuing to kind of itch his arm in like a tic, and his breathing was still exaggerated."  *Id*. at 29.  More specifically, Yoder noted that:

> As I was talking to him he just seemed nervous about the encounter, and part of that was just kind of itching his arm like this and just kind of having exaggerated breathing.  I could see his chest just kind of exaggerated what's

normal[ ] for most people.

*Id*.  Yoder did not describe the exaggerated breathing as being audible rather something he observed visually, adding "that it's a sign that they're under extra stress.  I guess just a sign of extra nervousness."  *Id*. at 29-30.  Yoder explained that behavior was something he has observed in the more than six years he had worked as a patrolman.  In his opinion, Pinkerton's behavior was "[e]xtra nervousness beyond [w]hat i[]s normal for a regular traffic stop."  *Id*. at 30.   This was noteworthy because Yoder had "already told [Pinkerton] at that point. . .he was just going to get a warning" for "[l]ane deviation."  *Id*.  Yoder added, "Most people once they know they're not going to get a ticket will kind of calm down especially when you engage them in topics that are unrelated to the stop" like Pinkerton's dumpster diving hobby and new puppy.  *Id*. at 31.

As Yoder reviewed the various computer records in the patrol car, he asked Pinkerton about whether there were any firearms in the truck.  Gov't. Ex. #1 at 06:32; 07:58.  After the second query, Pinkerton responded: "I've found triggers and all kinds of sh--.  When I found that trigger in these damn dumpsters, I was surprised.  I thought I might get a firearm [chuckling]."  Yoder asked about the holster again and Pinkerton explained:

> I've had that thing, probably about a month now.  I think, if I ain't mistaken, it came from, uh,…, sh--, down there by uh, oh, that spa place on, uh, William Street, close to downtown.  That little dumpster they got...  Apartments right there…  I think it came out of that apartment…  As a matter of fact, I'm pretty sure that's where it came from….

*Id*. at 08:25-09:00.

Yoder then asked, "Can I have your permission to search your vehicle for any firearms or anything in there?" *Id*. at 09:15. Pinkerton answered, "No, I mean there ain't none in there." After Pinkerton confirmed he would not consent to a search of his truck, the exchange continued:

Yoder: Is there any, uh, narcotics in there?

Pinkerton: No, no explosives.

Yoder: Okay. No, uh, marijuana?

Pinkerton: No.

Yoder: No cocaine?

Pinkerton: No, no.

Yoder: No methamphetamine?

Pinkerton: Nope.

Yoder: No heroin?

Pinkerton: No.

*Id*. at 09:17-09:32. Patrolman Yoder continued to review information on a computer monitor. After a pause, Pinkerton offered, "I'm just doin' a little running and stuff, and like I said I don't like vehicles real close to me, so whenever you got close I sped up,. . .I was dodging d--n holes and sh-- back there… The streets are really bad." *Id*. at 09:41-10:03.

Yoder had sensed there may be some criminal activity afoot shortly after he observed Pinkerton's traffic violations. Following Pinkerton's responses about the presence of firearms and controlled substances in his truck, Yoder inquired, "Would there

be any reason my narcotics canine would alert to the odor of narcotics coming from the vehicle?. . . Anyone else use the vehicle?" *Id*. at 10:01-10:08. As Pinkerton explained that he did let others use the truck, he became choked up and coughed. He answered, ". . .[dog] would smell it on me, wouldn't he? I mean, if I was sitting right here… I mean, there shouldn't be none in there." *Id*. at 10:15-10:24. Patrolman Yoder decided to conduct an exterior canine sniff of Pinkerton's truck as he:

> believed at that point from when [he] first observed the vehicle to [his] conversation with [Pinkerton] that [he] had built up reasonable suspicion that there was criminal activity that could possibly involve narcotics and there could be narcotics in the vehicle.

(Tr. at 34.) Consequently, Yoder conducted an exterior canine sniff. The dog alerted to the presence of a controlled substance odor within the truck. The sniff was initiated approximately eleven minutes after the dash camera video started. First, Pinkerton was asked to remove his puppy from the cab of the truck. He was instructed to stand on the side of the roadway with the backup officer. Time stamps on the dash camera video reflect that the canine sniff started about 90 seconds after the routine traffic matters were concluded. *See* Gov't. Ex. #1 at 12:30-14:15.

After Patrolman Yoder returned the canine to the patrol vehicle, he asked Pinkerton "if there was anything in the vehicle that wasn't his." Pinkerton replied that he had just given people a ride and they had smoked marijuana. He had difficulty answering any follow-up questions about the people. When further questioned, Pinkerton indicated the other people had been in the truck two or three days earlier. *Id*. at 15:00-15:35.

A couple of minutes into the search of the truck, Pinkerton advised the backup officer that there were two guns in a bag in the cab.  Patrolman Yoder recovered those handguns.  *Id*. at 19:15.  A third firearm was found several minutes later.  *Id*. at 26:32.

While Yoder's drug-detecting canine alerted to the presence of a controlled substance odor, no drugs were found in the truck.  That said, Pinkerton's puppy mysteriously recovered a bag of methamphetamine while the search was being conducted.  (Tr. 40.)  After the puppy allegedly discovered the bag of methamphetamine, Pinkerton voluntarily gave the substance to the backup officer.  The substance was then turned over to Yoder at which time Yoder placed Pinkerton under arrest.  A search of Pinkerton's person resulted in the seizure of a purported methamphetamine pipe in Pinkerton's pocket.

Patrolman Yoder explained that drug detecting canines alert to the odor of controlled substances, and not necessarily the presence of controlled substances, which can be referred to as the "popcorn effect."  He explained:

> When you cook popcorn at your house, you'll smell the popcorn - - even after you eat it, you're still smelling popcorn.  So even though the actual substance is not there the odor is still there.  That's why our K9 detected the odor of narcotics. . .

(Tr. at 41.)

In summary, Patrolman Yoder explained why he believed there was probable cause to conduct an exterior canine sniff before releasing Pinkerton after the traffic stop. He stated:

> My first view of the vehicle was it was coming from a high crime area

> from my experience.  The vehicle was crossing the centerline and holding inconsistent speeds, which can be a sign that they're. . .looking in their rearview mirror trying to figure out what the law enforcement officer is doing.
>
> When I conducted my stop and walked to the passenger side, he was already showing the signs of nervousness by being completely locked in on his rearview mirror and lighting a cigarette.
>
> While talking to him, he denies consent to search the person for weapons even though there was a holster there.  As I was conducting my *Terry* frisk he had bulges in his pockets, and I wanted to investigate further with that.
>
> As he was in my vehicle and I was speaking with him, he was having a further reaction for nervousness scratching his arm, the exaggerated breathing.  And then when I questioned him about narcotics, he had a change of behavior.  He became a little apprehensive.

*Id*. at 42-43.  The undersigned finds Patrolman Yoder's testimony was reliable and consistent with the videorecording of the traffic stop.

The next day, Pinkerton was interviewed by an Alcohol Tobacco, and Firearms Task Force Officer.  He admitted that the methamphetamine, guns, and other items recovered at the scene of the traffic stop belonged to him.

Pinkerton is charged with being a previously convicted felon in possession of a firearm. (Doc. 2.)  He requests suppression of the evidence seized on April 11, 2021, and the confession he made the following day.

## II.  Conclusions of Law

Pinkerton does not challenge the traffic stop nor the validity of the canine's alert signaling the presence of a controlled substance odor.  The issue before the Court is whether Patrolman Yoder had reasonable suspicion to prolong the traffic stop to conduct an exterior canine sniff of Pinkerton's vehicle.

**II.A.  Traffic Stops and Reasonable Suspicion**

It is well established that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure'" under the Fourth Amendment.  *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  The acceptable duration of a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns."  *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal quotation marks and citation omitted).

If an officer has a right to stop a driver, the officer may "conduct an investigation 'reasonably related in scope to the circumstances that justified the interference in the first place.'"  *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc) (quoting *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990)).  Ordinary tasks related to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Rodriguez*, 575 U.S. at 349.  It may also include requesting that the driver sit in the patrol car and asking the driver about his destination and purpose."  *Bloomfield*, 40 F.3d at 915.  These types of "checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."  *Rodriguez*, 575 U.S. at 349.  An officer may also ask questions of the vehicle's occupants that are unrelated to the violation, provided that doing so does not prolong the stop absent independent reasonable suspicion.  *Id.* at 355.

"Moreover, 'if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.'" *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995) (quoting *United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993)). The "critical question" is "not whether the dog sniff occurs before or after the officer issues a ticket, but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—the stop." *Rodriguez*, 575 U.S. at 357 (internal quotation marks and citation omitted). A traffic stop becomes unlawful "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. at 354.

"A dog sniff … is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and, unlike a routine check of a driver's license or insurance card, conducting a dog sniff "is not an ordinary incident of a traffic stop." *Id*. at 355-56. An officer who has stopped a driver for a traffic-related violation may not extend the stop for a dog sniff "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*.

The reasonable suspicion standard requires "'considerably less than proof of wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause.'" *Kansas v. Glover*, 589 U.S. ___, 140 S.Ct. 1183, 1187 (2020) (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017) (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir.

2002)).  The "suspicious facts" must be "'specific and articulable facts which, taken together with rational inferences from those facts,' amount to reasonable suspicion that further investigation is warranted." *Id*. (quoting *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016)).

In this case, Patrolman Yoder planned to give Pinkerton a verbal warning for a lane violation in the event the canine did not alert.  (Tr. 61.)  Pinkerton argues that "[s]ince this was predetermined prior to any search being conducted, there is no question that the canine search prolonged the original traffic stop, as a verbal warning takes mere seconds to complete."  (Doc. 43 at 2.)

It is true that Patrolman Yoder immediately advised Pinkerton that he intended to issue a warning ticket.  That said there were various routine procedures that needed to be completed for the traffic stop to be resolved such as checking car insurance (which Pinkerton did not have), license registration, and more.  Yoder engaged in these steps while he and Pinkerton were seated in the patrol car.  As those tasks were being addressed, Yoder's belief that reasonable suspicion of criminal activity was afoot continued to grow.  This permitted him to perform an exterior canine sniff of Pinkerton's vehicle when the routine tasks associated with the traffic stop were complete.

The general purpose of an exterior canine sniff is to confirm or dispel suspicions related to criminal activity.  Here, there was no waiting for a canine unit to arrive as Yoder was a certified canine officer and the dog was in the patrol car.  Even so, the use of the canine prolonged the stop in that without a positive alert for the presence of a controlled substance odor, Yoder intended to simply issue a verbal warning.

In reviewing the totality of the circumstances, the specific and articulable facts before Patrolman Yoder taken together with rational inferences gave him reason to believe criminal activity was afoot. When Patrolman Yoder made his passenger side approach to Pinkerton's vehicle, he requested a backup unit as he immediately perceived the potential for criminal activity. His initial observations included: the vehicle was travelling from a high crime area; Pinkerton's inconsistent driving behavior when he was aware of police presence—crossing the center line and failure to maintain speed; the lighting of a cigarette, which was viewed as a nervous behavior in Yoder's experience; and the driver's focus on the rearview mirror.

After the stop, several additional factors contributed to Patrolman Yoder's belief that criminal activity was afoot, including: the presence of an empty gun holster in the floorboard, bulges detected in Pinkerton's pocket during the pat down search, nervous behaviors during conversation in the patrol car, a change in behavior upon being questioned about narcotics, and continued nervousness even after being told Yoder intended to simply issue a warning ticket.

Additionally, Pinkerton lied about the presence of potholes as the cause for his erratic driving, and several of his answers to questions about the presence of guns or drugs were non-responsive to the question asked (*i.e.*, stating that there were no explosives in the vehicle in response to questions about the presence of specific drugs). Although Pinkerton initially denied the presence of controlled substances, he later stated that there "shouldn't be" any drugs in the truck.

The specific and articulable facts noted above, taken together with rational

inferences from those facts, amount to reasonable suspicion that further investigation was warranted. As such, Yoder was permitted to prolong the traffic stop to conduct the canine sniff. The canine's alert provided probable cause for the search of the truck. Thus, the physical evidence was lawfully seized, and it should not be suppressed.

**II.B.   Pinkerton's Statements**

Pinkerton made a request for the suppression of his statements as fruit of the alleged unlawful conduct described above. (Tr. 34 at 1.)

Insofar as Pinkerton made statements following a traffic stop, those statements should not be suppressed. The Supreme Court has compared routine traffic stops to *Terry* stops.

> [T]he usual traffic stop is more analogous to a so-called "*Terry* stop,". . ., than to a formal arrest." Under the Fourth Amendment, we have held a policeman who lacks probable cause but whose "observations lead him to reasonably suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881. . ."[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Ibid*. (quoting *Terry v. Ohio*. . .) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984) (citations omitted).  *See United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003), quoting *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir. 1986) ("No *Miranda* warning is necessary for persons detained for a *Terry* stop.").

Patrolman Yoder's questioning of Pinkerton during the traffic stop was reasonably related to his observations.  There is no legal basis for the suppression of Pinkerton's statements during the traffic stop.

Next, "[t]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984).  "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."  *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

In this case, because Patrolman Yoder developed reasonable suspicion warranting the intrusion of the canine sniff, Pinkerton's constitutional rights were not violated, and his statements were not fruit of the poisonous tree.  *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).  Pinkerton did not argue that his statements were involuntary or that there was a violation of *Miranda v. Arizona*, 384 U.S. 436, 448-450 (1966), so those issues are not considered.

Pinkerton's request for the suppression of his statements at the scene and in the Jail should be denied.

### III. Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Evidence (Doc. 34) be **denied**.

Further, the parties are advised that they have fourteen days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained. Failure to file objections by August 22, 2022, may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

Dated this 8th day of August, 2022.

                                                   s/*Abbie Crites-Leoni*
                                                   ABBIE CRITES-LEONI
                                                   UNITED STATES MAGISTRATE JUDGE