UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:21-cr-00063-SRC |
| BENJAMIN R. PINKERTON, | ) ) ) |
| Defendant. | ) |

## **Order**

    This criminal case involves man's best friend, more precisely two of them. Debo, a trained law-enforcement canine, conducted an external sniff of Defendant Pinkerton's truck and alerted to the presence of drugs. Debo wasn't the only dog sniffing around. After Pinkerton exited the truck, his dog Zilly, an apparently untrained pup who knew his owner better than Debo did, eagerly sniffed out the ground and found a bag of methamphetamine. Pinkerton later admitted to ATF that the methamphetamine—and three guns—belonged to him. Convicted felon Pinkerton moved to suppress the drugs, the three guns, and his statements. After conducting two evidentiary hearings, U.S. Magistrate Judge Abbie Crites-Leoni issued a Report and Recommendation of denial of the motion.

    Here the Court addresses Pinkerton's objections to the Report and Recommendation. Pinkerton raises a number of objections and argues that Officer Yoder did not have reasonable suspicion to prolong the traffic stop beyond the time reasonably required to complete the mission of issuing him a warning ticket for lane deviation. The record consists of briefing on Pinkerton's motion, two evidentiary hearing transcripts, post-hearing briefing, Officer Yoder's bodycam video, and a photo Officer Yoder took of all the items discovered in Pinkerton's truck.

On de novo review, the Court adopts, as modified below, the findings of fact set forth in the R&R and overrules Pinkerton's objections.

I.      **Factual background**

Shortly before midnight on a spring evening, Cape Girardeau Police Department Patrolman and Canine Handler Gabriel Yoder noticed an older model GMC pickup cross the centerline several times. Doc. 41 at 12:18–15:13. When Yoder began following the truck, the driver reduced its speed down to around 20–25 miles per hour in a 35-mile-per-hour zone. Patrolman Yoder noted that the speed "just became inconsistent." *Id.* at 15:9–17:6. Based on those observations, Yoder activated his traffic lights and the truck pulled over. *Id.* at 17:7–13.

As Yoder approached the truck, the bodycam video shows that he paused momentarily; he testified that he noticed "that the driver had a freshly lit cigarette in his mouth and was looking intently into his . . . driver's side mirror." *Id.* at 17:23–25; *see also* Gov't Ex. 1 at 1:10–1:20 . Yoder approached from the passenger side because "[i]t's safer not to be approaching [the driver's side] in traffic." Doc. 41 at 18:1–5; Gov't Ex. 1 at 01:10–01:20. Yoder believed that:

> . . . based on where the vehicle was coming from, the inconsistent driving behavior that appeared to be in my presence and being - - trying to be able to pay attention to what I was doing and then lighting a cigarette which people do when they're nervous, and then locking [sic] very intently in the rearview mirror looked like there was something going on, and I didn't know what. So at that time I requested a second unit to arrive.

Doc. 41 at 18:19–19:1.

That wasn't Yoder's routine procedure for a standard traffic stop. *Id.* at 19:2–6. He explained that he calls for a second unit when "[t]here are several . . . things that may lead you to believe that there's some sort of criminal activity going on." *Id.* at 19:7–9. Once he arrived at the passenger side window, Officer Yoder observed Pinkerton—the only person in the vehicle—

2

in the driver's seat.  *Id.* at 19:19–20:4; Gov't Ex. 1 at 01:10–01:20.  Yoder asked Pinkerton if "his vehicle's alignment was all right due to the crossing of the centerline several times."  Doc. 41 at 20:21–23; Gov't Ex. 1 at 01:20–01:35.  Pinkerton responded that "he was trying to avoid potholes."  Doc. 41 at 20:21–23; Gov't Ex. 1 at 01:20–01:35.  Yoder testified that as he followed Pinkerton, Yoder himself neither noticed any significant potholes nor needed to cross the centerline to avoid potholes.  Doc. 41 at 20:24–21:8.

Next, Yoder asked Pinkerton for proof of insurance.  *Id.* at 21:9–10; Gov't Ex. 1 at 01:50–02:05.  Pinkerton responded that his insurance was expired, and he did not have any old copies that he could provide to Officer Yoder.  Doc. 41 at 21:9–19; Gov't Ex. 1 at 01:50–02:05.  Yoder had observed that the pickup bed was loaded with a large volume of items.  Doc. 41 at 21:20–22:19.  He also noticed an empty pistol holster on the center floorboard in plain view.  *Id.; see also* Gov't Ex. 1 at 02:15–02:35.  Yoder asked Pinkerton if he was moving.  Pinkerton replied "that he goes dumpster diving."  Doc. 41 at 21:20–22:19; Gov't Ex. 1 at 02:15–02:25, 04:28–04:46.

Pinkerton was then asked to hop out of the vehicle and into the patrol car so Yoder could issue him a "warning ticket."  Doc. 41 at 57:25–58:6; Gov't Ex. 1 at 02:05–02:10.[1]  Yoder explained that he routinely does this because "[o]n traffic stop safety it makes it easier to talk to people, and it eliminates the possibility that if they want to flee they can just keep on driving and initiate a vehicle pursuit, and it's easier to hear what they're saying."  Doc. 41 at 23:1–5.

Once Pinkerton was outside of the truck, Yoder asked, "Any firearms on you?  I saw you had a holster in there."  Gov't. Ex. 1 at 02:22–02:35.  Pinkerton appeared surprised by the

---

[1] The Report and Recommendation included the factual finding that "[b]ased on his observation of the empty pistol holder, Yoder asked Pinkerton to step out of the vehicle."  The Court declines to adopt this finding as it lacks support in the record.  *See* Doc. 41 at 23:1–5.  The Court does not attribute any weight to this sentence, and it does not affect the outcome of the Court's review.

3

question and asked, "Holster?"  *Id.*  Yoder responded, "There was like a holster in that bag right in the center."  *Id.*  After a delay, Pinkerton answered, "No, I don't have no firearms on me."  *Id.*  Yoder then requested permission to search Pinkerton for weapons.  *Id.* at 02:30 – 02:47.  Pinkerton did not consent to a search of his person.  *Id.*  He claimed that he did not have any weapons.  *Id.*

Next, Patrolman Yoder conducted a *Terry* frisk for weapons.  Doc. 41 at 23:19–22; Gov't Ex. 1 at 02:45–04:05.  During the pat down, Pinkerton advised Yoder that he had a knife in his pocket.  Gov't Ex. 1 at 02:45–04:05.  Pinkerton removed the knife and gave it to Yoder, who put it in his pocket for safety purposes.  *Id.*  Yoder did not locate any additional weapons during the pat down.  *Id.*  He then directed Pinkerton to take a seat in the patrol vehicle.  *Id.*

Patrolman Yoder explained that having a driver sit in the patrol vehicle is "usually quicker.  I can talk to them while I'm running their information and stuff.  And that way I don't have to come back and forth to them."  Doc. 41 at 25:5–7.  He noted that was a routine part of every traffic stop, during which he verifies that the subject's license is valid, whether they have any warrants, their driving history, whether the license plates are active and for the correct vehicle, and prior law enforcement contacts with Cape Girardeau Police Department (CGPD).  *Id.* at 25:20–27:7.  Pinkerton did not have any outstanding warrants on a system called MULES, but he did have prior contacts with CGPD.  *Id.* at 26:16–27:7.  Yoder reviewed this information on a laptop computer in his patrol vehicle.  *Id.* at 27:13–16.

While reviewing the MULES and CGPD records, Yoder engaged Pinkerton in conversation about the empty holster he observed in plain view, a puppy that was in the passenger side of the truck cab, and Pinkerton's dumpster diving hobby.  *Id.* at 27:24–29:1; Gov't Ex. 1 at 04:10–11:00.  It was a friendly conversation.  *Id.*  Yoder explained that he usually tries "to engage in something in that manner with most people just because most people

4

get a little nervous with law enforcement, so [he] tr[ies to] calm them down." Doc. 41 at 28:4–29:1. Even though Yoder made those efforts, he observed that Pinkerton "was continuing to kind of itch his arm in like a tic, and his breathing was still exaggerated." *Id.* at 29:13–17.

More specifically, Yoder noted that:

> As I was talking to him he just seemed nervous about the encounter, and part of that was just kind of itching his arm like this and just kind of having exaggerated breathing. I could see his chest just kind of exaggerated what's normal[ ] for most people.

*Id.* Yoder did not describe the exaggerated breathing as being audible rather something he observed visually, adding "that it's a sign that they're under extra stress. I guess just a sign of extra nervousness." *Id.* 29:18–24. Yoder explained that behavior was something he has observed in the more than six years he had worked as a patrolman. *Id.* at 30:2–14. In his opinion, Pinkerton's behavior was "[e]xtra nervousness beyond [w]hat [is] normal for a regular traffic stop." *Id.* at 30:11–14. This is noteworthy because Yoder had "already told [Pinkerton] at that point . . . he was just going to get a warning" for "[l]ane deviation." *Id.* at 30:11–31:4. Yoder added, "Most people once they know they're not going to get a ticket will kind of calm down especially when you engage them in topics that are unrelated to the stop" like Pinkerton's dumpster diving hobby and new puppy. *Id.*

As Yoder reviewed the various computer records in the patrol car, he asked Pinkerton about whether there were any firearms in the truck. Gov't. Ex. 1 at 07:55–08:17. After the second query, Pinkerton responded: "I've found - - I've found sh*t - - triggers and all kinds of sh*t in the damn dumpsters. Surprised when I found that damn trigger, I thought damn there might be a damn firearm in here [chuckling]."[2] *Id.* Yoder asked about the holster again and Pinkerton explained:

---

[2] After reviewing the audio, the Court finds the quote to be slightly, but not materially, different. Doc. 62 at p. 6.

> Uh . . . sh*t I've had that thing, probably about a month now.  I think, if I ain't mistaken, it came from, uh, . . . , sh*t, down there by uh, oh, that spa place on, uh, William Street, close to downtown.   That little dumpster they got . . . Apartments right there . . . Apartments right there . . . I think it came out of that apartment. . . . I'm pretty sure that's where it came from . . .

Gov't Ex. 1 at 08:17-09:00.

Yoder then asked, "Can I have your permission to search your vehicle for any firearms or anything in there?" *Id.* at 09:08–09:17.   Pinkerton answered, "No, I mean there ain't none in there." *Id.*   After Pinkerton confirmed he would not consent to a search of his truck, the exchange continued:

| | |
|---|---|
| Yoder: | Is there any, uh, narcotics in there? |
| Pinkerton: | No, no explosives. |
| Yoder: | Okay.  No, uh, marijuana? |
| Pinkerton: | No. |
| Yoder: | No cocaine? |
| Pinkerton: | No, no. |
| Yoder: | No methamphetamine? |
| Pinkerton: | Nope. |
| Yoder: | No heroin? |
| Pinkerton: | No. |

*Id.* at 09:17-09:32.  Patrolman Yoder continued to review information on a computer monitor.

*Id.* at 09:32–09:42.   After a pause, Pinkerton offered, "I'm just doin' a little running and stuff,

---

The R&R states that Pinkerton said: "I've found triggers and all kinds of sh--. When I found that trigger in these damn dumpsters, I was surprised.   I thought I might get a firearm [chuckling]."   The Court now believes Pinkerton stated:   "I've found - - I've found sh*t - - triggers and all kinds of sh*t in the damn dumpsters.   Surprised when I found that damn trigger, I thought damn there might be a damn firearm in here [chuckling]."

6

and like I said I don't like vehicles real close to me, so whenever you got close, I sped up, . . . I was dodging damn holes and sh*t back there . . . The streets are really bad." *Id.* at 09:42–10:02.

Yoder had sensed there may be some criminal activity afoot shortly after he observed Pinkerton's traffic violations.  Doc. 41 at 34:17–35:15.  Following Pinkerton's responses about the presence of firearms and controlled substances in his truck, Yoder inquired, "Would there be any reason my narcotics canine would alert to the odor of narcotics coming from the vehicle? . . . Anyone else use the vehicle?" Gov't Ex. 1 at 10:00–10:08.  As Pinkerton explained that he did let others use the truck, he became choked up and coughed.  *Id.* at 10:08–10:24.  He answered, ". . . [dog] would smell it on me, wouldn't he?   I mean if I was sitting right here . . . I mean, there shouldn't be none in there." *Id.*  Patrolman Yoder decided to conduct an exterior canine sniff of Pinkerton's truck as he:

> believed at that point from when [he] first observed the vehicle to [his] conversation with [Pinkerton] that [he] had built up reasonable suspicion that there was criminal activity that could possibly involve narcotics and there could be narcotics in the vehicle.

Doc. 41 at 34:17–21.  Consequently, Yoder conducted an exterior canine sniff.  *Id.* at 35:16–20. The dog alerted to the presence of a controlled substance odor within the truck.  *Id.*   The sniff was initiated approximately eleven minutes after the dash camera video started.  *Id.* at 12:30. First, Pinkerton was asked to remove his puppy from the cab of the truck, which Pinkerton did. Pinkerton was then instructed to stand on the side of the roadway with the backup officer, which he did.  *Id.* at 10:38–11:32.  Time stamps on the dash camera video reflect that Debo's canine sniff started about 90 seconds after the routine traffic matters were concluded.  *See id.* at 11:00–12:30.

After Patrolman Yoder returned Debo to the patrol vehicle, he asked Pinkerton "if there was anything in the vehicle that wasn't his." *Id.* at 14:36–14:52.  Pinkerton replied that he had

7

just given people a ride and they had smoked marijuana.  *Id.* at 15:00–15:10.  He had difficulty answering any follow-up questions about the people.  *Id.* at 15:10–15:55.  When further questioned, Pinkerton indicated the other people had been in the truck two or three days earlier.  *Id.*

A couple of minutes into the search of the truck, Pinkerton advised the backup officer that there were two guns in a bag in the cab.  *Id.* at 18:57–19:20.  Patrolman Yoder recovered those handguns.  *Id.* at 21:05–21:40.  A third firearm was found several minutes later.  *Id.* at 26:32.

While Debo, a drug-detecting canine, alerted to the presence of a controlled substance odor, no drugs were found in the truck.  Doc. 41 at 40:3–12.  That said, Pinkerton's puppy mysteriously[3] recovered a bag of methamphetamine while the search was being conducted.  *Id.*  After the puppy allegedly discovered the bag of methamphetamine, Pinkerton voluntarily gave the substance to the backup officer.  *Id.*  The substance was then turned over to Yoder at which time Yoder placed Pinkerton under arrest.  *Id.* at 40:13–16.  A search of Pinkerton's person resulted in the seizure of a purported methamphetamine pipe in Pinkerton's pocket.  *Id.* at 40:17–19.

Patrolman Yoder explained that drug-detecting canines alert to the odor of controlled substances, and not necessarily the presence of controlled substances, which can be referred to as the "popcorn effect."  *Id.* at 41:9–25.  He explained:

> When you cook popcorn at your house, you'll smell the popcorn - - even after you eat it, you're still smelling popcorn. So even though the actual substance is not there the odor is still there.  That's why our K9 detected the odor of narcotics . . .

*Id.*

---

3 The R&R uses this term, and on de novo review, the Court interprets it to mean "inexplicably," as the record contains no explanation of how the puppy discovered the bag of methamphetamine.  The Court does note that a puppy sniffing around for scents is entirely consistent with puppy behavior.

8

In summary, Patrolman Yoder explained why he believed probable cause existed to conduct an exterior canine sniff before releasing Pinkerton after the traffic stop.  *Id.* at 42:15–43:12.  He stated:

> My first view of the vehicle was it was coming from a high crime area from my experience.  The vehicle was crossing the centerline and holding inconsistent speeds, which can be a sign that they're . . . looking in their rearview mirror trying to figure out what the law enforcement officer is doing.
>
> When I conducted my stop and walked to the passenger side, he was already showing the signs of nervousness by being completely locked in on his rearview mirror and lighting a cigarette.
>
> While talking to him, he denies consent to search the person for weapons even though there was a holster there. As I was conducting my *Terry* frisk he had bulges in his pockets, and I wanted to investigate further with that.
>
> As he was in my vehicle and I was speaking with him, he was having a further reaction for nervousness scratching his arm, the exaggerated breathing.   And then when I questioned him about narcotics, he had a change of behavior.   He became a little apprehensive.

*Id.*

The next day, Pinkerton was interviewed by an Alcohol Tobacco, and Firearms Task Force Officer.  He admitted that the methamphetamine, guns, and other items recovered at the scene of the traffic stop belonged to him.

## II.    Procedural background

In May 2021, a federal grand jury returned a one-count indictment, charging Pinkerton with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  Docs. 1–2.  In October 2021, Pinkerton filed a Motion to Suppress Evidence and Statements, seeking to suppress "any physical evidence seized from the person or possession of [Pinkerton] on April 11, 2021, and any oral or written statements or other writings made by [Pinkerton]."  Doc. 34.  The Court referred Pinkerton's motion to U.S. Magistrate Judge Abbie Crites-Leoni.  *See* 28 U.S.C. § 636(b).  After holding two evidentiary hearings and ordering post-hearing briefing,

9

Judge Crites-Leoni issued a Report and Recommendation detailing her factual findings, legal conclusions, and recommendations on Pinkerton's motion. Doc. 62 at p. 17; *see also* Docs. 34, 36–37, 41, 43–45, 49, 55, 58–59, 61. The R&R recommends that the Court deny Pinkerton's motion. Doc. 62 at p. 17. Pinkerton timely filed objections to the R&R. Doc. 65.

**III.   Standard**

When a party objects to a magistrate judge's report and recommendation, the district judge must conduct a de novo review of the portions of the report, findings, or recommendations to which the party objected. *See* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (citing 28 U.S.C. § 636(b)(1)). In making its de novo determination, the Court reviewed the entire record, including the transcripts of the November 3, 2021 and May 24, 2022 evidentiary hearings as well as the exhibits submitted by the United States, which are Officer Yoder's bodycam video and the photo Officer Yoder took of the items discovered in Pinkerton's truck . *See* Docs. 34, 36–37, 41, 43–45, 49, 55, 58–59, 61–62, 65.

**IV.   Discussion**

**A.   Findings of fact**

Pinkerton concedes the accuracy of the facts cited in the R&R; however, he claims that the R&R omitted additional "important" facts that he claims the record establishes. Doc. 65 at p. 1. Pinkerton claims that the facts listed below "are important in considering whether the particularized, objective facts, taken together with *rational* inferences, reasonably warranted suspicion that a crime was committed." *Id.* (italics in original). The Court addresses each of Pinkerton's suggested facts in turn while at all times viewing the record in light of the totality of the circumstances.

        **1.**        **High crime area**

Pinkerton first argues that the Court should take into consideration that "[t]he entirety of Cape Girardeau [is] considered a high crime area according to internet data." *Id.* at p. 1. Pinkerton previously raised a similar argument in his post-hearing brief and cites to those exhibits in his R&R objections. Doc. 43 at p. 3; Doc. 43-1. In his post-hearing brief, Pinkerton stated:

> According to the internet page, Crimegrade (exhibits A and B), the entire downtown of Cape Girardeau could be labeled as a "high crime area". This website analyzes the crime in the area for both property and violent crimes. Then the website color codes the areas by safest (dark green) to the most dangerous (red). As can be seen in the exhibits that anything south of Bertling Street and West of Mt. Auburn could be classified in the intermediate to dangerous crime areas. This alleged offense occurred near the Show-Me Center, north of downtown, near the University.

Doc. 43 at p. 3. At the first evidentiary hearing, Officer Yoder indicated that Pinkerton "was coming from a high crime area from [his] experience." Doc. 41 at 42:18–19. The exhibits that Pinkerton points the Court to support Officer Yoder's testimony. Officer Yoder further stated that Pinkerton was "coming from Emerald Street out on Sprigg, which [he] knew is a common area for narcotic and – and firearm calls for us." *Id.* at 15:6–7. As Pinkerton describes it, the exhibits that he points the Court to represents a website that "analyzes the crime in an area for *both property and violent crimes.*" Doc. 43 at p. 3 (emphasis added). Neither Pinkerton's description nor the exhibits themselves make any mention of considering drug-related crimes. The Court has considered the entire record and finds, on de novo review, that in making her recommendation, Judge Crites-Leoni properly credited Officer Yoder's testimony regarding Pinkerton's traveling from the direction of a high-crime area.

11

### 2. Reasons for lane deviation

Pinkerton next points to Officer Yoder's testimony that crossing the centerline and holding inconsistent speeds can be a result of a distracted driver or tired driver. Doc. 65 at p. 2; *see also* Doc. 41 at 45:22–46:2. The Court agrees with both Pinkerton and Officer Yoder that crossing the centerline and holding inconsistent speeds can be a result of a distracted driver or tired driver. However, Pinkerton did not deny that he crossed the centerline; he admitted to crossing the centerline and said "the only reason he was moving like that" was due to potholes in the road. Gov't Ex. 1 at 01:21–01:40. The Court finds, on de novo review, that whether Pinkerton was districted or tired has no impact on the Court's determination on Pinkerton's motion, as Pinkerton does not challenge the traffic stop. Further, the Court finds that based on Officer Yoder's own observations, he could reasonably have disbelieved Pinkerton's pothole-avoidance explanation for his erratic driving; the Court additionally finds that Pinkerton's behavior after the lawful traffic stop gave further rise to Officer Yoder's reasonable suspicions.

### 3. Lack of nervousness

Pinkerton next points to his "lack of apparent nervousness in the way [he] smokes his cigarette in the video recording of the traffic stop," Doc. 65 at p. 2, and the fact Officer Yoder testified that he had "no personal knowledge whether lighting a cigarette when [he] stopped the car was normal for [Pinkerton]," Doc. 41 at 54:21–23. Officer Yoder also conceded that while he thinks he saw Pinkerton light the cigarette, he can't remember for sure, and he didn't write it down in his log. *Id.* at 48:25–49:9. The Court has considered the entire record, and the Court finds, on de novo review, that Officer Yoder still had reasonable suspicions of criminal activity regardless of the timing or the normalcy of the lit cigarette.

### 4. Pinkerton's eyes

Pinkerton next points out that Officer Yoder initially testified that when he approached Pinkerton's truck, he observed Pinkerton "looking intently into his rearview mirror or his driver's side mirror," but that Officer Yoder later testified that he could not see where Pinkerton's eyes were looking or whether his eyes were moving, fixed, or even open at all. Doc. 65 at p. 2; *see also* Doc. 41 at 17:23–25, 49:18–50:25.  Pinkerton also points to Officer Yoder's testimony that it's natural to look in the driver rearview mirror to see an approaching officer.  Doc. 65 at p. 2; *see also* Doc. 41 at 47:4–13.  While the bodycam footage does not specifically show Pinkerton's eyes, it does show that the front of Pinkerton's face was placed directly in front of, and he appears to be staring directly into, his driver's side mirror.  Gov't Ex. 1 at 01:05–1:22.  Pinkerton's did not change the position of his head until Officer Yoder approached the passenger side of his truck and said "Hello, Sir."  *Id.*  The Court has considered the entire record, and finds on de novo review, that Judge Crites-Leoni properly credited Officer Yoder's testimony that in sum Pinkerton's behaviors while the officer approached the truck contributed to the officer's reasonable suspicion.

### 5. Pinkerton's stopping immediately

Pinkerton next points out that he immediately stopped, did not attempt to flee, and that Officer Yoder had no issue as to the manner in which Pinkerton pulled over his truck.  Doc. 65 at pp. 2–3.  The Court agrees that Pinkerton did immediately stop his truck but finds that this fact has no impact on the Court's determination on Pinkerton's motion as the Court finds that the totality of the circumstances led to Officer Yoder's reasonable suspicion.

### 6. No attempts to conceal

Pinkerton next points out that he made no attempts to conceal anything upon Officer Yoder's approaching his truck and there were no visible weapons on or near Pinkerton during the

13

stop. *Id.* at p. 3.  The Court agrees that nothing in the record suggests that Pinkerton attempted to conceal anything or that weapons were visible on his person or in his truck.  However, the Court finds, on de novo review, that this fact has no impact on the Court's determination on Pinkerton's motion as the Court finds that the totality of the circumstances led to Officer Yoder's having reasonable suspicion.

### 7.       No signs of intoxication

Pinkerton next points out that Officer Yoder did not believe that he was intoxicated by drugs or alcohol.  *Id*.  Again, the Court agrees that nothing in the record suggests that Pinkerton was intoxicated.  However, the Court finds, on de novo review, that this fact has no impact on the Court's determination on Pinkerton's motion as again, the Court finds that the totality of the circumstances properly led to Officer Yoder's having reasonable suspicion.

### 8.       Pinkerton's compliance

Pinkerton next points out that he complied with all of Officer Yoder's requests and answered all of Officer Yoder's questions.  *Id.*  While the Court agrees that Pinkerton was compliant, the Court notes that Pinkerton's behavior while answering Officer Yoder's questions did give rise to Officer Yoder's reasonable suspicion.  Officer Yoder testified that Pinkerton had exaggerated breathing, continuously scratched his arms, and became sensitive when questioned about narcotics.  Doc. 41 at 31:7–11, 35:10–14.  At one point during the conversation, Pinkerton switched topics and started to re-question the validity of the stop.  *Id.* at 31:14–21.  The Court finds, on de novo review, that Pinkerton's compliance has no impact on the Court's determination on Pinkerton's motion as the Court finds that the totality of the circumstances properly led to Officer Yoder's having reasonable suspicion.

14

### 9. History of narcotics

Pinkerton next points out that Officer Yoder looked for previous narcotics involvement, weapons violations, and anything dangerous in Pinkerton's past and did not see any of those sorts of incidents. Doc. 65 at p. 3. The Court finds, on de novo review, that Pinkerton's history of narcotics (or lack thereof as he suggests) has no impact on the Court's determination that Officer Yoder had reasonable suspicion.

### 10. K-9 Debo's training

Pinkerton next points out that K-9 Debo was trained to alert to the odor of narcotics and not explosives. Doc. 65 at p. 3. The Court agrees and finds that the Report and Recommendation accurately sets forth this fact. *See* Doc. 62 at p. 8.

### 11. Gun holster and firearms

Pinkerton next points out that the gun holster (one of the facts listed by the magistrate judge for reasonable suspicion) was never taken into evidence or pictured. Doc. 65 at p. 3. Pinkerton also points out that the gun holster is not visible in the video recording. *Id.* While the Court agrees that the gun holster was never taken into evidence and is not visible in the video recording, the Court finds that the video recording supports the holster's presence as Officer Yoder and Pinkerton discussed the holster and Pinkerton conceded to possessing the holster for about a month. Indeed, had no holster been present in the truck, the Court expects that Pinkerton would have in some way voiced objection to Officer Yoder's questioning about it; but Pinkerton did just the opposite and engaged in related dialogue about how he thought he might find a firearm during a particular dumpster dive.

Pinkerton lastly points out that Officer Yoder continuously questioned Pinkerton about firearms up until 09:17 in the video recording. *Id.* The Court finds, on de novo review, that

15

Officer Yoder's questioning Pinkerton about possessing firearms was reasonable considering Officer Yoder's observing an empty holster in Pinkerton's truck.

The Court overrules Pinkerton's objections and adopts, incorporates, and sustains the findings of fact set forth in Judge Crites-Leon's Report and Recommendation, Doc. 62, as modified above.

### B.      Conclusions of law

Pinkerton concedes that the R&R correctly cites the applicable law.   Doc. 65 at p. 3.   However, Pinkerton would like to add that "when determining whether an officer developed *reasonable suspicion,* [the court] must look at the 'totality of circumstances.'"   *Id.* at pp. 3–4 (citing *United States v. Arvizu*, 534 U.S. 266, 274 (2002)).   On de novo review, the Court finds that Judge Crites-Leoni, having credited Officer Yoder's testimony, correctly applied the totality-of-the-circumstances standard in finding that Officer Yoder had reasonable suspicion to believe that criminal activity may be afoot.   As such, Officer Yoder's search was proper, and the Court overrules Pinkerton's objection and adopts, incorporates, and sustains the conclusions of law set forth in Judge Crites-Leon's Report and Recommendation, Doc. 62.

## V.     Conclusion

The Court sustains, adopts, and incorporates United States Magistrate Judge Abbie Crites-Leoni's [62] Report and Recommendation, as modified, and denies Defendant Benjamin Pinkerton's [34] Motion to Suppress Evidence and Statements.

So Ordered this 21st day of September 2022.

                                                                             _____
                                                                             STEPHEN R. CLARK
                                                                             UNITED STATES DISTRICT JUDGE